**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SELWYN BROWN,** | : | |
| **Plaintiff** | : | **No. 1:21-cv-01436** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **JOHN WETZEL, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court is a motion to dismiss and/or motion for summary judgment (Doc. No. 12) filed by Defendants.  Also before the Court are the two (2) motions to stay the proceedings (Doc. Nos. 16, 17) filed by Plaintiff.  For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion, and the Court will deny, in their entirety, Plaintiff's motions.  The Court will also afford Plaintiff the opportunity to file an amended complaint.  Should Plaintiff wish, however, to forego the filing of an amended complaint and proceed to discovery on his surviving claims, he will be permitted to do so.

**I.     BACKGROUND**

Plaintiff Selwyn Brown ("Plaintiff"), who is proceeding pro se and in forma pauperis, is incarcerated within the Pennsylvania Department of Corrections ("DOC") and currently housed at the State Correctional Institution in Huntingdon, Pennsylvania ("SCI Huntingdon").  He commenced this civil rights action on August 19, 2021, by filing a complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq. against the following Defendants: Secretary of the DOC, John Wetzel ("Wetzel"); Administrative Staff at the DOC, Karen Merritt-Scully; SCI Huntingdon Superintendent, Kevin Kauffman ("Kauffman"); and SCI Huntingdon Correctional Officer Travis Walker ("Walker").  (Doc. No. 1.)

In the complaint, Plaintiff sets forth the following allegations.  On November 4, 2020, he submitted a request slip to Defendant Walker, inquiring as to why he was being classified as a Security Threat Group ("STG").  (Id. ¶ 11.)  On November 19, 2020, Defendant Walker responded to Plaintiff's request slip and stated that Plaintiff was "found to be in possession of publications, gang related tattoos, and using . . . symbols related to gang activity[.]"  (Id. ¶ 12.)  That same day, Plaintiff responded to Defendant Walker by stating that he had never been a member of any gang and that, even though he is a devout member of the God Centered Culture of the Nation and Gods and Earths ("NGE"),[1] this religious group is not a gang, and it never has been.  (Id. ¶ 13.)

On November 23, 2020, Defendant Walker called Plaintiff to the Security Office to speak with him about the STG matter.  (Id. ¶ 14.)  Defendant Walker confirmed that the STG label was placed on Plaintiff due to his adherence to NGE practices.  (Id.)  On November 25, 2020, Defendant Walker responded to Plaintiff's November 19, 2020 request slip and stated that he would "reach out to some people and see what [he could] find out."  (Id. ¶ 15.)  Plaintiff subsequently sent a request slip to Defendant Walker, inquiring about the status of Defendant Walker's investigation.  (Id. ¶ 16.)  Defendant Walker informed Plaintiff that he had "reached out" and "was told that it would remain."  (Id.)

Around mid-January of 2021, Plaintiff was mailed NGE literature and, specifically, a National Newspaper entitled "The Five Percenter,"[2] which the DOC held "for an excessive amount of time before ultimately denying delivery" of this mail and returning it to its sender on

---

[1]  NGE is "also known as 'Five Percent Nation' and/or 'Five Percenters.'"  (Doc. No. 1-7 at 1.)

[2]  In the complaint, Plaintiff refers to this National Newspaper as "The Five Percenter" and as "The Five Percentage."  (Doc. No. 1 ¶¶ 22, 23.)  He has since clarified that this National Newspaper is referred to as the "The Five Percenter."  (Doc. No. ¶¶ 4, 23.)

March 4, 2021.  (Id. ¶ 17.)  On May 24, 2021, Plaintiff wrote to Defendant Wetzel explaining

that the NGE is a recognized religious group, that there is no justification for classifying his

adherence to NGE practices as STG and that, by doing so, it places "substantial burdens" on

those religious practices.  (Id. ¶ 18.)  On June 28, 2021, Defendant Merrit-Scully responded to

Plaintiff's letter "on behalf of" Defendant Wetzel and recommended that Plaintiff utilize the

inmate grievance system to address his STG classification.  (Id. ¶ 19.)

In addition, at Plaintiff's most recent parole hearing in November of 2020, the STG

classification was taken into consideration, thus resulting in his third parole denial.  (Id. ¶ 20.)

Plaintiff asserts that his parole denials in 2018 and 2019 were "pretextual in nature" and

"intended to mask the Parole Board's plain intent to deny [him] parole" so long as he is "still a

devout adherent to his NGE practices."  (Id. ¶ 21.)

Plaintiff has expressed to all Defendants that his right to live in accordance with the

tenets of NGE "cannot be made criminal" as that imposes a substantial burden on his religious

exercise.  (Id. ¶ 22.)  Plaintiff alleges that Defendants Wetzel, Kauffman, and Walker have

neither shown nor proven that the restrictions imposed by classifying him as STG are reasonably

related to a penological interest or that they constitute the least restrictive means of furthering

such a penological interest.  (Id. ¶ 23.)

Plaintiff asserts that Defendants acted with deliberate and reckless indifference to his

constitutional rights when, after they were made aware of the substantial burden that was being

placed on his NGE practices, they still refused to accommodate his right to practice his religious

faith.  (Id. ¶¶ 24-28.)   In addition, he maintains that Defendants have treated him differently

from similarly situated prisoners who belong to other religious groups, such as Christianity,

Nation of Islam, Pagans Buddhism, Hinduism, and Taoism.  (Id. ¶¶ 29-31.)  Finally, Plaintiff

asserts that Defendants have conspired to classify him as STG because of his NGE practices. (Id. ¶¶ 32-39.)

In connection with all of these allegations, Plaintiff asserts violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as violations of RLUIPA. (Id. ¶ 47-81.)  Plaintiff seeks declaratory relief, injunctive relief, nominal damages, punitive damages, compensatory damages, the costs of this action, and any further relief as the Court deems appropriate.  (Id. at 21-22.)

On November 2, 2021, Defendants filed a motion to dismiss the complaint, along with a brief in support.  (Doc. Nos. 12, 13.)  That same day, the Court, observing that Defendants had raised the issue of whether Plaintiff properly exhausted his administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"), issued a Paladino Order informing the parties that it would consider the issue of exhaustion in the context of summary judgment and, by doing so, it would review matters outside the pleadings in its role as factfinder.[3]  (Doc. No. 14.)  In that Order, the Court directed Defendants to file a statement of material facts that complied with Rule 56.1 of the Court's Local Rules.  (Id.)  Defendants filed their statement of facts on November 16, 2021.  (Doc. No. 15.)

Initially, in lieu of filing a response to Defendants' motion, Plaintiff filed a motion to stay on December 3, 2021.  (Doc. No. 16.)  In his motion, Plaintiff requests that the proceedings be stayed to allow him to exhaust administrative remedies.  (Id. at 2.)  Plaintiff then filed a supplemental motion to stay (Doc. No. 17), followed by a brief in opposition to Defendants' motion to dismiss and/or motion for summary judgment (Doc. No. 18), as well as a responsive

---

[3]  See Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018).

statement to Defendants' statement of material facts (Doc. No. 19).  As reflected by the docket, Defendants have not responded to Plaintiff's motions or brief in opposition, and the time period for doing so has elapsed.

Thus, Defendants' motion to dismiss and/or motion for summary judgment is ripe for the Court's disposition.  In addition, Plaintiff's motions to stay the proceedings pending exhaustion of administrative remedies are also ripe for the Court's deposition.  In accordance with the legal standards set forth below, the Court will grant in part and deny in part Defendants' motion, and the Court will deny, in their entirety, both of Plaintiff's motions.

## II.     LEGAL STANDARDS

### A.     Motion to Dismiss

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that their claims

are facially plausible.  See Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203,

210 (3d Cir. 2009).  The plausibility standard requires more than a mere possibility that the

defendant is liable for the alleged misconduct: "[W]here the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has

not 'show[n]' – 'that the pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (citing Fed. R.

Civ. P. 8(a)(2)).

Accordingly, the United States Court of Appeals for the Third Circuit has identified the

following steps that a district court must take when reviewing a 12(b)(6) motion: (1) identify the

elements that a plaintiff must plead to state a claim; (2) identify any conclusory allegations

contained in the complaint that are "not entitled" to the assumption of truth; and (3) determine

whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to

an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010)

(internal citations and quotation marks omitted).  The Third Circuit has specified that in ruling on

a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the

complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly

authentic documents if the complainant's claims are based upon these documents."  See Mayer v.

Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White

Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In the context of pro se prisoner litigation, the court must be mindful that a document

filed pro se is "to be liberally construed."  See Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A

pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than

formal pleadings drafted by lawyers" and can be dismissed for failure to state a claim only if it

appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

**B.    Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to

interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

As noted supra, when determining whether an issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant.  These rules apply with equal force to all parties.  See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

III.    **DISCUSSION**

Plaintiff has filed his complaint pursuant to Section 1983, claiming that Defendants violated the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well RLUIPA.  (Doc. No. 1.)  Although Defendants have a raised a number of arguments in response to these alleged violations, the Court begins with what it deems to be their threshold argument—that Plaintiff failed to exhaust available administrative remedies at SCI Huntingdon before commencing this suit.  (Doc. No. 13 at 14-17.)   As already set forth above, it was this exhaustion argument that caused the Court to issue a <u>Paladino</u> Order, which informed the parties that it would be considering the issue of administrative exhaustion in the context of a motion for summary judgment and that, by doing so, it would review matters outside of the pleadings in its role as factfinder.[4]  (Doc. No. 14.)  Thus, unlike Defendants' other arguments, which will be assessed against standards governing a motion to dismiss, this exhaustion argument will be assessed against standards governing a motion for summary judgment.

   A.       **Exhaustion of Available Administrative Remedies**

Under the Court's Local Rules, a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  <u>See</u> M.D. Pa. L.R. 56.1. In addition, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in [the moving party's statement], as to which [the non-moving party] contend[s] that there exists a genuine issue to be tried."  <u>See</u> <u>id.</u>  In accordance with these Rules, the parties have filed

---

[4] <u>See</u> <u>Paladino</u>, 885 F.3d 203.

their respective statements.  (Doc. Nos. 15, 19.)  Thus, the material facts, which underpin the threshold issue of whether Plaintiff exhausted his available administrative remedies at SCI Huntingdon, are derived from those statements.  To the extent that there are any genuine disputes of material fact stemming from those statements, the Court will expressly note such disputes herein.

In his complaint, Plaintiff alleges that "he has improperly been classified with [an STG] designation due to his belief in [NGE]."  (Doc. Nos. 15 ¶ 3, 19 ¶ 3.)  Plaintiff also alleges that, around mid-January of 2021, he was mailed NGE literature, which the DOC held for an excessive amount of time before ultimately denying delivery of this mail and returning it to its sender on March 4, 2021 (Doc. No. 1 ¶¶ 17, 23), thus placing a substantial burden on him by preventing him from studying and practicing the NGE tenets (Doc. Nos. 15 ¶ 4, 19 ¶ 4).  Plaintiff further alleges that Defendants' actions violated RLUIPA, as well as the First, Eighth, and Fourteenth Amendments, and that Defendants had conspired to violate those rights.  (Doc. Nos. 15 ¶¶ 6-8, 19 ¶¶ 6-8.)

In addition to these allegations, Plaintiff also includes a section in his complaint wherein he identifies the steps he took in exhausting his administrative remedies.  (Doc No. 1 ¶¶ 41-46; Doc. Nos. 15 ¶ 5, 19 ¶ 5.)  The DOC's Inmate Grievance Policy, set forth in DC-ADM 804, "provides an administrative procedure through which inmates can seek resolution of problems, including monetary relief[.]"  (Doc. Nos. 15 ¶ 9, 19 ¶ 9.)  If informal resolution is unsuccessful, DC-ADM 804 "provides a three-step process for resolution of inmate grievances: the initial grievance at the institutional level, an appeal to the Facility Manager (Superintendent)[,] and an appeal for final review to the [Secretary's Office of Inmate Grievances and Appeals ('SOIGA')]."  (Doc. Nos. 15 ¶ 10, 19 ¶ 10.)

DC-ADM 804 requires the inmate to identify all individuals directly involved in the complained-of-events and to include a statement of relevant facts.  (Doc. Nos. 15 ¶¶ 11-12, 19 ¶¶ 11-12.)  The statement of relevant facts must "include the date, approximate time, and location of the event(s) that gave rise to the grievance."  (Doc. Nos. 15 ¶ 12, 19 ¶ 12.)  The inmate must also "specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law."  (Id.)

Michael Bell is employed as an Administrative Officer at SOIGA and "is the records custodian for all grievance appeals submitted."  (Doc. Nos. 15 ¶¶ 14-15, 19 ¶¶ 14-15.)  Andrea Wakefield is the Superintendent's Assistant at SCI Huntingdon, and her responsibilities "require her to review and track all grievances filed [there] and [to] refer all properly submitted grievances to an appropriate grievance officer for response."  (Doc. Nos. 15 ¶¶ 16-17, 19 ¶¶ 16-17.)  She also serves as a records custodian for all submitted grievances.  (Doc. Nos. 15 ¶ 18, 19 ¶ 18.)  A review of the grievance records indicates that Plaintiff has filed sixty (60) grievances during his incarceration at SCI Huntingdon, and nineteen (19) of those grievances were appealed to final review.  (Doc. Nos. 15 ¶¶ 19-20, 19 ¶¶ 19-20.)

Defendants contend that "[g]rievance no. 912948, date[d] February 1, 2021, is the only one pertaining to the STG [d]esignation for [Plaintiff] being a member of NGE[.]"  (Doc. No. 15 ¶ 21.)  Defendants also contend, however, that grievance no. 912948 does not identify Defendants Wetzel, Kauffman, or Merritt-Scully (id. ¶ 22), and it "does not state [that] Defendants Wetzel, Kauffman, Walker[,] or Merritt-Scully confiscated and prohibited Plaintiff from receiving his National Newspaper literature, 'The Fiver Percent[er],' nor any other type of religious publications"  (id. ¶ 23).  In support of these contentions, Defendants have submitted

grievance no. 912948, and its related responses and appeals, into the summary judgment record. (Doc. No. 15-1 at 50-60.)

Plaintiff does not dispute Defendants' contentions concerning grievance no. 912948. (Doc. No. 19 ¶ 21.)  Instead, Plaintiff contends that he filed two other grievances pertaining to his STG classification for being a member of NGE.  (Id.)  Those are grievance nos. 956715 and 957169 (id.), and Plaintiff has submitted those grievances into the summary judgment record (id. at 17-38).  Unlike grievance no. 912948, grievance nos. 956715 and 957169 reference Defendants Wetzel, Kauffman, and Merritt-Scully.  (Id. at 18-19, 30-32.)

In connection with these contentions, Plaintiff has filed two (2) motions to stay the proceedings pending his exhaustion of these supplemental grievances.  (Doc. Nos. 16, 17.) Plaintiff argues that his "request are [sic] not untimely because . . . the events presented in said matter and pending grievances are still ongoing violations[.]"  (Doc. No. 17 at 2, ¶ 6.)  Plaintiff, however, is mistaken.  For the reasons discussed below, the Court accepts Defendants' argument that, with respect to some of the named Defendants and with respect to some of the asserted claims, Plaintiff has failed to exhaust available administrative remedies at SCI Huntingdon.

Under the PLRA's exhaustion requirement, "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility **until** such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a) (emphasis added).  In other words, exhaustion of available administrative remedies is a prerequisite for Plaintiff (a prisoner) bringing suit under Section 1983 and RLUIPA (a federal law) regarding his prison conditions. See Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring

any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); Booth v. Churner, 532 U.S. 731, 733-34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

Requiring a plaintiff to exhaust available administrative remedies before filing a complaint in federal court advances the policy justifications of the PLRA—to "return[ ] control of the inmate grievance process to prison administrators, encourage[ ] the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits." See Downey, 968 F.3d at 305 (citation and internal quotation marks omitted) (alterations added)); Jones, 549 U.S. at 204 (explaining that the exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court").

Thus, in light of these governing principles, the Court must determine whether Plaintiff exhausted available administrative remedies **before** commencing suit in this Court.[5] Consequently, to the extent that Plaintiff has requested a stay of the proceedings in order to exhaust administrative remedies that he filed at SCI Huntingdon **after** he commenced this suit

---

[5]  The issue of whether a prisoner has properly exhausted his administrative remedies is a question of law that is to be determined by the Court, even if that determination requires the resolution of facts that are in dispute.  See Small v. Camden County, 728 F.3d 265, 268 (3d Cir. 2013).  As noted above, in accordance with Paladino, 885 F.3d at 211, the Court issued an Order on November 2, 2021, placing the parties on notice that it would consider exhaustion in its role as factfinder, and it afforded the parties an opportunity to be heard under Small.  (Doc. No. 14.)

(Doc. Nos. 16, 17), the Court will deny his requests.  Plaintiff is not permitted to fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after filing his complaint.  See Ahmed v. Dragovich, 297 F.3d 201, 209 n.9 (3d Cir. 2002) ("'Congress could have written a statute making exhaustion a precondition to judgment, but it did not. The actual statute makes exhaustion a precondition to *suit*.'" (quoting Perez v. Wis. Dep't of Corr., 182 F.3d 532, 534-35 (7th Cir.1999)) (emphasis in original)); Garrett v. Wexford Health, 938 F.3d 69, 85-86 (3d Cir. 2019) (observing that substantial compliance with the PLRA's exhaustion requirement does not encompass "the filing of a suit before administrative exhaustion . . ." (citing Ahmed, 297 F.3d at 209)).

The summary judgment record reflects that the only grievance Plaintiff filed at SCI Huntingdon before he commenced suit in this Court is grievance no. 912948.  Accordingly, the Court must determine whether Plaintiff completed proper exhaustion with respect to this grievance.  Under the PLRA, proper exhaustion "mean[s] 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'"  See Downey, 968 F.3d at 305 (quoting Woodford, 548 U.S. at 88).  And the applicable "procedural rules are supplied by the individual prisons."  See id. (citations omitted); Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances . . .").  Particularly relevant here is that a prisoner's failure to follow these procedural rules will result in a procedural default of the claims, thus barring the prisoner from bringing suit in federal court.  See id. at 227-32; Scott v. CO Smoke, No. 19-cv-1387, 2019 WL 7163465, at *2 (M.D. Pa. Dec. 20, 2019) (stating that prisoners "who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named

14

defendants, are barred from subsequently litigating claims in federal court" (citing <u>Spruill</u>, 372 F.3d 218)).

With respect to the procedural rules that apply here, the parties' undisputed material facts establish that the DOC's Inmate Grievance Policy, set forth in DC-ADM 804, "provides a three-step process for resolution of inmate grievances: the initial grievance at the institutional level, an appeal to the Facility Manager (Superintendent)[,] and an appeal for final review to [SOIGA]." (Doc. Nos. 15 ¶ 10, 19 ¶ 10.)  The parties' undisputed material facts also establish: that DC-ADM 804 requires the inmates to identify all individuals directly involved in the relevant events and to also include a statement of relevant facts (Doc. Nos. 15 ¶¶ 11-12, 19 ¶¶ 11-12); that this statement of relevant facts must "include the date, approximate time, and location of the event(s) that gave rise to the grievance" (Doc. Nos. 15 ¶ 12, 19 ¶ 12); and that the inmates must also "specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law" (<u>id.</u>).

Defendants argue that Plaintiff failed to include such information in grievance no. 912948 (Doc. No. 13 at 16-17), and the Court agrees.  Although grievance no. 912948 names Defendant Walker, it does not mention Defendants Wetzel, Kauffman, and Merritt-Scully.  In addition, it does not supply any relevant facts or dates with respect to Defendants Wetzel, Kauffman, and Merritt-Scully.  And, finally, it does not contain any allegations concerning the NGE National Newspaper of which Plaintiff's complains he has been deprived.  Thus, for all of these reasons, the Court finds that grievance no. 912948 did not comply with the applicable procedural rules of DC-ADM 804.  <u>See Downey</u>, 968 F.3d at 305 (stating that "[t]he PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules'" (quoting <u>Woodford</u>, 548 U.S. at 88)); <u>Jones</u>,

549 U.S. at 218 (stating that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules[, which are] rules that are defined not by the PLRA, but by the prison grievance process itself" (citation and internal quotation marks omitted)).[6]

Consequently, the Court finds that Plaintiff has procedurally defaulted his Section 1983 and RLUIPA claims against Defendants Wetzel, Kauffman, and Merritt-Scully and his claim concerning the NGE National Newspaper.  This procedural default may be excused, however, if Plaintiff can show that the administrative remedies at SCI Huntingdon were unavailable to him. See Rinaldi v. United States, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting Woodford, 548 U.S. at 93)).  "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a

---

[6] In Jones, the United States Supreme Court concluded that the state prisoners' § 1983 actions were not automatically rendered non-compliant with the PLRA when those prisoners had failed to identify all of the named defendants in previous administrative grievances.  See Jones, 549 U.S. at 217.  In support, the Supreme Court explained that the PLRA does not contain a "name all defendants" requirement in order to properly exhaust.  See id.  The Supreme Court also explained, however, that proper exhaustion requires completion of the administrative review process in accordance with the relevant procedural rules, which are not defined by the PLRA, but by the prison's internal grievance process.  See id. at 218.  As such, the Supreme Court stated that the level of detail that will be necessary for an inmate to comply with the administrative review process "will vary from system to system and claim to claim[.]"  See id.  In this case, the DOC's administrative review process, as set forth in DC-ADM 804, expressly requires that the inmates "**shall** identify individuals directly involved in the event(s)."  See DC-ADM 804, Inmate Grievance System Procedures Manual § 1.A.11.b (emphasis added).  The Court notes that this is distinguishable, and materially so, from the facts in Jones, where the pertinent prison policy did not impose a requirement on inmates to identify the wrongdoers.  See Jones, 549 U.S. at 218 (stating that the Michigan Department of Corrections' policy did not require the prisoners "to identify a particular responsible party" and, thus, the policy did not support a "conclusion that the grievance process was improperly invoked simply because an individual later named as a defendant was not named at the first step of the grievance process").

grievance process through machination, misrepresentation, or intimidation.'" <u>Downey</u>, 968 F.3d at 305 (quoting <u>Shifflett v. Korszniak</u>, 934 F.3d 356, 365 (3d Cir. 2019)).

In considering whether this procedural default should be excused, the Court is mindful of the basic principle that, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." <u>See</u> <u>Rinaldi</u>, 904 F.3d at 268 (citation and internal citation omitted).  In other words, Plaintiff is the one who shoulders the burden of establishing that administrative remedies were unavailable to him at SCI Huntingdon.

In his briefing, Plaintiff has asserted several grounds upon which he appears to argue that his procedural default should be excused.  Initially, Plaintiff argues that Defendant Walker was "withholding" the identity of "all parties involved with [his] STG designation" and that he was, therefore, "only able to identify Defendant Walker[.]"  (Doc. No. 18 at 20.)  Next, Plaintiff argues that he could not have named Defendants Wetzel and Merritt-Scully in grievance no. 912948 because the correspondence he had with these two (2) individuals occurred after he filed that grievance.  (<u>Id.</u> at 21.)  Finally, Plaintiff argues that Defendant Kauffman had "personal involvement" because he was the Facility Manger who issued the response to grievance no. 912948 on appeal, and thus, such personal involvement excuses any procedural default.  (<u>Id.</u>)  The Court addresses each of these arguments in turn.

To the extent that Plaintiff argues that Defendant Walker thwarted his efforts to properly exhaust by withholding the identity of "all parties involved[,]" the Court is unpersuaded.[7]  There are neither any allegations in the complaint, nor any evidence in the summary judgment record,

---

[7]  Plaintiff raises no arguments concerning his failure to exhaust his claims concerning the NGE National Newspaper.

to support this bare-bones assertion.  Plaintiff, quite simply, has not shown that Defendant

Walker prevented him "from taking advantage of [the] grievance process through machination,

misrepresentation or intimidation[.]"  See Ross, 578 U.S. at 638.  In any event, the record belies

Plaintiff's contention that he did know the identity of these Defendants.  It was Plaintiff himself

who wrote to Defendant Wetzel, who received a response from Defendant Merritt-Scully on

behalf of Defendant Wetzel, and who received a grievance appeal response from Defendant

Kauffman.  Thus, the record plainly demonstrates that Plaintiff knew the identity of these

Defendants.  See Rinaldi, 904 F.3d at 268 (explaining that "the onus" is on the prisoner to

establish that the administrative remedies were unavailable to him); Hardy v. Shaikh, 959 F.3d

578, 587 (3d Cir. 2020)  (reiterating that "the burden to plead and prove that he was thwarted

rests on the inmate . . .").  As such, the Court finds that Plaintiff has not met his burden to show

that his failure to exhaust administrative remedies should be excused.

Additionally, to the extent that Plaintiff argues that he could not name Defendants Wetzel

or Merritt-Scully in grievance no. 912948 because he did not have any correspondence  with

them until after he filed grievance no. 912948, the Court is once again unpersuaded.  Even if the

Court accepts this fact as true—that Plaintiff corresponded with Defendants Wetzel and Merritt-

Scully after he filed and fully appealed grievance no. 912948—the Court still finds that Plaintiff

has not presented any allegations in the complaint or submitted any evidence into the summary

judgment record which would suggest that he could not file another grievance naming

Defendants Wetzel and Merritt-Scully and alleging facts relevant to them.  See Singleton v.

Beadle, No. 17-cv-220, 2018 WL 1129300, at *5 (M.D. Pa. Feb. 26, 2018) (concluding that

prisoner-plaintiff had "failed to present any facts or evidence that prison officials obstructed his

attempt to exhaust administrative remedies, such that he would have been prevented from filing a

18

new, separate grievance regarding any claims against [d]efendants Bopp and Ferguson[,]" both of whom Plaintiff had failed to file a grievance against).  As such, the Court finds that Plaintiff has not met his burden in showing that his failure to exhaust administrative remedies should be excused.

Finally, to the extent that Plaintiff argues that Defendant Kauffman responded to his grievance appeal and, thus, had personal involvement in the wrongdoing such that any procedural default concerning exhaustion should be excused, the Court finds that this argument is misplaced.  Whether or not Plaintiff has sufficiently alleged and ultimately proven that Defendant Kauffman was personally involved in the asserted constitutional harms under Section 1983 is a separate question from whether Plaintiff exhausted his administrative remedies under the PLRA.  In other words, the Court finds that Plaintiff is not excused from exhaustion merely because Defendant Kauffman is the Facility Manager who responded to Plaintiff's grievance appeal.  See Martinez v. Ransom, No. 20-cv-1826, 2022 WL 178814, at *6 (M.D. Pa. Jan. 19, 2022) (concluding that prisoner-plaintiff was "not excused from administratively exhausting claims against [defendant] Ransom—as required by the PLRA—simply because [defendant] Ransom is the prison superintendent or Facility Manager who denied relief under DC-ADM 804").  As such, the Court finds that Plaintiff has not met his burden in showing that his failure to exhaust administrative remedies should be excused.

In reaching this conclusion, the Court finds it worth mentioning that Defendants have submitted documentation reflecting Plaintiff's grievance history since being incarcerated at SCI Huntingdon.  That documentation reflects that Plaintiff has filed sixty grievances from January 2014 to the present.  (Doc. No. 15-1.)  Plaintiff, therefore, is no stranger to SCI Huntingdon's grievance system.  In fact, after Defendants filed their instant motion to dismiss and/or motion

for summary judgment asserting failure to exhaust, Plaintiff returned to that grievance system and filed two (2) more grievances in an attempt to cure his procedural default. (Doc. No. 19 at 17-38.)  As discussed above, however, the PLRA requires Plaintiff to properly exhaust his available administrative remedies **before** filing a complaint and haling Defendants into federal court.

Accordingly, for all of these reasons, the Court finds that Plaintiff has provided no basis to excuse his failure to exhaust available administrative remedies and, thus, he has procedurally defaulted his claims against Defendants Wetzel, Merritt-Scully, and Kauffman, as well as his claim concerning the NGE National Newspaper.  Consequently, the Court will grant summary judgment in favor of Defendants on this basis.  Plaintiff, therefore, will only be permitted to proceed on his surviving Section 1983 and RLUIPA claims as they pertain to Defendant Walker.[8]

B.      **Plaintiff's Claims**

Plaintiff filed his complaint pursuant to Section 1983, claiming that Defendants violated the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well RLUIPA.  (Doc. No. 1.)  Plaintiff also claims that Defendants conspired to commit these violations.  (Id.)  The Court begins its discussion with Section 1983, which provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

---

[8]  While the Court will continue to refer to Defendants, as they have collectively filed the instant motion to dismiss and/or motion for summary judgment, the Court's discussion below will be focused on Defendant Walker.

See 42 U.S.C. § 1983.  Thus, "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States."  See Shuman v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005) (citation omitted).  Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right."  See id. (citation omitted).

### 1.      Personal Involvement

Defendants argue that Defendant Walker should be dismissed from this action due to his lack of personal involvement in the alleged wrongdoing.  (Doc. No. 13 at 10-14.)  Defendants are correct that, in order for liability to attach under Section 1983, a plaintiff must sufficiently allege that each defendant was personally involved in the act or acts that the plaintiff claims violated his federally protected rights.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (citing Rode, 845 F.2d at 1207); Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020) (stating that "[p]ersonal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence'" (quoting Rode, 845 F.2d at 1207)).  Thus, in pursuing any Section 1983 claim against prison officials, a plaintiff may not rely exclusively on respondeat superior, see id. (citation omitted), which is a theory of liability that "arises 'solely on the basis of the existence of an employer-employee relationship,' regardless of whether the employer had any part in causing harm[.]"  See Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (quoting Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 692 (1978)).

As set forth above, Defendant Walker has been named as a correctional officer who is employed by the DOC and works at SCI Huntingdon. (Doc. No. 1 ¶ 7.) Defendants argue that Plaintiff is attempting to impose liability against Defendant Walker based upon his alleged role in responding to Plaintiff's inmate requests[9] concerning the STG classification. (Doc. No. 13 at 13-14.) Defendants argue, however, that Defendant Walker's responses to those requests are insufficient to establish his personal involvement in the asserted constitutional violations. (Id.)

Generally speaking, the Court agrees with Defendants' proposition that the mere filing of a grievance is insufficient to impute the actual knowledge that is necessary to demonstrate a defendant's personal involvement in an asserted constitutional violation. See Rode, 845 F.2d at 1207-08 (finding that the mere filing of a grievance with the Governor-defendant's office was insufficient to demonstrate that the Governor himself had personal knowledge of the alleged wrongdoing). Under certain circumstances, however, a grievance may be sufficient to place a defendant on notice of continued wrongdoing and, thus, may show actual knowledge of and acquiescence in the events that form the basis of the plaintiff's asserted constitutional claims. See, e.g., Sutton v. Rasheed, 323 F.3d 236, 249-50 (3d Cir. 2003), as amended (May 29, 2003) (finding that prisoner-plaintiffs had established the personal involvement of a defendant who had played an "active role" in the continued denial of plaintiffs having access to religious texts and basing this finding, in part, on the fact that the defendant had issued a written response denying a final-grievance-appeal letter from one of the plaintiffs, which requested access to such religious

---

[9] Under DC-ADM 804, inmates are "encouraged to attempt resolution of a concern informally by use of a DC-135A, Inmate Request to Staff Member or direct conversation with the Unit Manager or Officer-in-Charge prior to submitting a DC-804, Part 1, Official Inmate Grievance Form[.]" See DC-ADM 804, Inmate Grievance System Procedures Manual § 1.A.3. In other words, Plaintiff attempted informal resolution by submitting inmate requests to Defendant Walker. (Doc. No. 1 ¶¶ 11, 13.)

texts); Diaz v. Palakovich, 448 F. App'x 211, 215 (3d Cir. 2011) (unpublished) (vacating district court's grant of summary judgment where the district court had failed to consider grievances pertaining to a pattern of ongoing wrongful conduct, and explaining that a reasonable factfinder could find that (a) the defendants had knowledge of such wrongful conduct through the prisoner's grievances and (b) had acquiesced in such conduct by failing to address the ongoing pattern of wrongful conduct).

Here, the complaint alleges that Defendant Walker not only received but reviewed, investigated, and responded to Plaintiff's inmate requests concerning the STG classification and the substantial burden that it places on Plaintiff's NGE practices. (Doc. No. 1 ¶¶ 11-16, 19, 34-35.) Thus, the Court finds that the complaint has sufficiently alleged the personal involvement of Defendant Walker such that liability can attach under Section 1983. See Parkell, 833 F.3d at 336 n.14 (noting that the Third Circuit's "oft-cited holding in Rode[, 845 F.2d at 1208,] that the mere filing of a grievance does not show actual knowledge by a supervisor is not applicable, as [defendant's] letters show that he actually had reviewed the grievances[,]" and quoting Sutton v. Rasheed, 323 F.3d 236, 249–50 (3d Cir. 2003) for the following proposition: that "an official who wrote back in response to a grievance had 'played an active role' in a constitutional violation"). Accordingly, to the extent that Defendants seek dismissal of Defendant Walker for lack of personal involvement, their motion will be denied.

### 2.   First Amendment Free Exercise of Religion and RLUIPA Claims

Next, Defendants argue that the First Amendment freedom of religion and RLUIPA claims must be dismissed from the complaint because Plaintiff's NGE practices have not been substantially burdened and because the DOC has a legitimate penological interest in classifying Plaintiff as STG for being a part of the Five Percent Nation—that penological interest being, to

ensure the safety and security of the prison and those within it.  (Doc. No. 13 at 17-20.)  Plaintiff, however, adamantly opposes Defendants' arguments and points to specific paragraphs in the complaint to show that he has set forth sufficient allegations that the STG classification has placed a substantial burden on his NGE practices and that the STG classification does not represent the least restrictive means of furthering a compelling government interest.  (Doc. No. 18 at 22-26.)  Plaintiff thus argues that the Court should deny Defendants' motion to dismiss and allow his First Amendment claim and his RLUIPA claim to proceed.  (Id. at 26.)  The Court agrees and addresses both of these claims below.

a.      **Free Exercise Clause of the First Amendment**

Plaintiff claims that Defendants violated the Free Exercise Clause of the First Amendment to the United States Constitution (Doc. No. ¶¶ 48, 55, 62, 69, 75), which provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"  See U.S. Const. amend. I.  The First Amendment applies to the States through the Fourteenth Amendment.  See United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott, 463 U.S. 825, 831 (1983) (stating that the First Amendment applies to the States "by virtue of the Due Process Clause of the Fourteenth Amendment . . . ").

With respect to the prison setting, the United States Supreme Court has stated that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison[,]" and, thus, they "clearly retain protections afforded by the First Amendment[.]"  See O'Lone v. Est. of Shabazz, 482 U.S. 342, 348 (1987) (citations and internal quotation marks and citations omitted).  That being said, the lawful incarceration of prisoners necessarily limits "many privileges and rights," which is "justified by the considerations underlying our penal system."  See id.  (citation and internal quotation marks omitted).  Those

24

limitations "arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." See id. (citations omitted).

The United States Supreme Court has "often said that [the] evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination." See id. at 349 (citations and internal quotation marks omitted). Thus, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." See Turner v. Safley, 482 U.S. 78, 89 (1987) (alteration omitted). This standard "ensures the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration . . . and[, additionally, this standard] avoids unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." See O'Lone, 482 U.S. at 349-50 (citations and internal quotation marks omitted).

Courts are to consider several factors when determining the reasonableness of a prison regulation that infringes on inmates' constitutional rights, including: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it[;]" (2) "whether there are alternative means of exercising the right that remain open to prison inmates[;]" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[;]" and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." See Turner, 482 U.S. at 89-91 (citations and internal quotation marks omitted).

25

Regarding these factors, while prison officials are required to demonstrate that a rational connection exists between the regulation and a legitimate penological interest, the inmate bears the ultimate burden of demonstrating that the regulation is unconstitutional.  See Fontroy v. Beard, 559 F.3d 173, 177 (3d Cir. 2009) (citation omitted); Monroe v. Beard, 536 F.3d 198, 207 (3d Cir. 2008) (stating that "the party challenging the prison regulation bears the burden of showing that it is constitutionally unreasonable" (citation omitted)).  Thus, because the inmate "must overcome the presumption that the prison officials acted within their broad discretion[,]" the inmate's burden is a "heavy" one.  See Shaw v. Murphy, 532 U.S. 223, 232 (2001) (citation and internal quotation marks omitted).

In addition, the United States Court of Appeals has held that "a prerequisite to the application of Turner is the assertion of only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection."  See Williams v. Morton, 343 F.3d 212, 217 (3d Cir. 2003) (citation and internal quotation marks omitted); DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000) (explaining that "two threshold requirements" must be met before particular beliefs will be afforded protection under the First Amendment, and they are that: (1) the beliefs are sincerely held; and (2) the beliefs are religious in nature (citation, and internal citation and quotation marks omitted)).  In other words, the United States Constitution does not protect a "mere assertion of a religious belief[.]"  See id.

Here, Defendants do not meaningfully challenge whether the complaint satisfies these threshold requirements—i.e., that Plaintiff's beliefs are both sincerely held and religious in nature.  (Doc. No. 13 at 19 (stating, in passing, that Plaintiff "has not indicated" the specific "tenets" of NGE).)  Instead, Defendants have moved directly to the application of Turner and have argued that (1) Plaintiff's religious practices were not substantially burdened and that (2)

even if the Court were to conclude otherwise, the DOC has a valid penological interest in designating inmates as STG—i.e., for reasons related to prison safety and security.  (Id. at 19-20.)  The Court, however, is unpersuaded by Defendants' arguments.

The complaint plainly alleges that the STG classification "substantially burdens [Plaintiff's] ability to study the Supreme Mathematics and Supreme Alphabets, to study his 120 lessons and [to] have access to the NGE's National Newspaper 'The Five Percenter' so that [he] can read and study it among other practiced tenets within the NGE practice."[10]  (Doc. No. 1 ¶ 22.)  The complaint also alleges that Defendants (now Defendant Walker) have not shown or proven that the restrictions imposed by classifying Plaintiff as STG are reasonably related to a penological interest, nor have Defendants pursued the least restrictive means of furthering that interest.  (Id. ¶ 23.)

Additionally, it is this Court's view that, even though there may be situations in which application of the Turner factors can occur based upon the parties' pleadings alone, frequently a developed factual record is essential to determining whether prison officials have demonstrated that the restrictions or limitations they have imposed upon the inmate's constitutional rights are rationally related to a valid penological objective.  See Kelly Bey v. Bechtold, No. 20-cv-1241, 2021 WL 2550230, at *3 (M.D. Pa. June 22, 2021) (stating that "such a multi-faceted fact-intensive test as Turner's does not generally lend itself to being addressed in the context of a motion to dismiss" (citation and internal quotation marks omitted); Ramirez v. Pugh, 379 F.3d 122, 128 (3d Cir. 2004) (remanding to the district court to "identify with particularity the specific

---

[10] As discussed above, Plaintiff procedurally defaulted his claims based on allegations that he was denied the NGE National Newspaper. Thus, Plaintiff's remaining claim appears to be that the STG classification itself poses a constitutional violation.  Defendants have acknowledged the same.  (Doc. No. 13 at 17.)

rehabilitative goals advanced by the government to justify the restriction at issue, and [to] give the parties the opportunity to adduce evidence sufficient to enable a determination as to whether the connection between these goals and the restriction is rational under Turner"); Warren v. Pennsylvania, 316 F. App'x 109, 115 (3d Cir. 2008) (unpublished) (acknowledging "the legitimacy of [d]efendants' interest in promoting prison safety and security[,]" but concluding that the record was not developed enough to engage in the Turner analysis "because of [d]efendants' less than thorough briefing and [the inmate's] unfocused arguments . . . "); Thompson v. Smeal, 513 F. App'x 170, 173 (3d Cir. 2013) (unpublished) (concluding that the district court had erroneously granted summary judgment on the inmate's First Amendment and Equal protection claims where "the record was not properly developed with regard to the Turner factors").

Thus, for all of these reasons, the Court cannot conclude as a matter of law that the STG policy was related to a valid penological objective under Turner.  As a result, the Court will deny Defendants' motion on this basis, and the Court will permit Plaintiff's First Amendment claim to proceed against Defendant Walker, the only remaining Defendant.

## b.   RLUIPA

RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person" furthers "a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  See 42 U.S.C. § 2000cc-1(a).  "Several provisions of RLUIPA underscore its expansive protection for religious liberty."  Holt v. Hobbs, 574 U.S. 352, 358 (2015).  "[R]eligious exercise" is defined "capaciously to include 'any exercise of religion,

whether or not compelled by, or central to, a system of religious belief." Id. (quoting 42 U.S.C. § 2000cc–5(7)(A).  In addition, "Congress mandated that this concept 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" See id. (quoting 42 U.S.C. § 2000cc–3(g)).  Congress also stated that "RLUIPA 'may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.'" See id.  (quoting 42 U.S.C. § 2000cc–3(c)).

Under RLUIPA, a prisoner bears the initial burden of showing that his religious exercise is grounded in a sincerely held religious belief and that the defendant's action has substantially burdened his religious exercise.  See id. at 360-61.  Once the prisoner makes this showing, the burden shifts to the defendant to show that the substantial burden on the prisoner's religious exercise furthers "'a compelling governmental interest'" and "'[is] the least restrictive means of furthering that compelling governmental interest.'"  See id. at 362 (quoting 42 U.S.C. § 2000cc–1(a)).

Here, Defendants raise the same arguments with respect to Plaintiff's RLUIPA claim as they did above, with respect to Plaintiff's First Amendment claim.[11]  Thus, the Court observes, once more, that Defendants have not meaningfully disputed the sincerity of Plaintiff's religious beliefs.  (Doc. No. 13 at 19 (stating, in passing, that Plaintiff "has not indicated" the specific "tenets" of his NGE religion).)  Instead, they argue that Plaintiff's religious practices were not substantially burdened and that, even if the Court were to conclude otherwise, the DOC has a

---

[11]  To be clear, Defendants have addressed the First Amendment claim and the RLUIPA claim simultaneously in their briefing, raising one argument as to both claims.  (Doc. No. 13 at 17-20.)

valid penological interest in designating inmates as STG—i.e., for reasons related to prison safety and security. (Id.)

As the Court has already discussed above, however, the complaint specifically alleges that the STG classification substantially burdens Plaintiff's religious exercise and, specifically, his "ability to study the Supreme Mathematics and Supreme Alphabets, to study his 120 lessons and [to] have access to the NGE's National Newspaper 'The Five Percenter' so that [he] can read and study it among other practice tenets within the NGE practice." (Doc. No. 1 ¶ 22.) The complaint also alleges that Defendants (now Defendant Walker) have not shown or proven that they have pursued the least restrictive means in further their compelling interest. (Id. ¶ 23.)

Thus, in accepting these allegations as true and in construing these allegations and all reasonable inferences from these allegations in the light most favorable to Plaintiff, the Court finds that the complaint has plausibly stated a violation of RLUIPA. The Court will, therefore, allow Plaintiff's RLUIPA claim to proceed against Defendant Walker, but only to the extent that Plaintiff seeks declaratory and injunctive relief from Defendant Walker in his official capacity. (Doc. No. 1 at 21-22). To the extent that Plaintiff seeks damages from Defendant Walker in his individual capacity, such claims will be dismissed from this action. See Mack v. Warden Loretto FCI, 839 F.3d 286, 303 (3d Cir. 2016) (reiterating its prior holding that RLUIPA "does not provide for damages against state officials sued in their individual capacities"); Sharp v. Johnson, 669 F.3d 144, 155 (3d Cir. 2012) (holding that RLUIPA does not authorize an action against state officials in their individual capacities for damages).[12]

---

[12] The Court has a continuing statutory obligation to review pro se complaints brought by plaintiffs granted leave to proceed in forma pauperis. See 28 U.S.C. § 1915(e)(2)(B). Thus, it is of no import that Defendants have not addressed Plaintiff's request for relief under RLUIPA.

3.        **Eighth Amendment**

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'"  Glossip v. Gross, 576 U.S. 863, 876 (2015).  In order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test: (1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'"  See Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety.  See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citing DeShaney v. Winnebago Co. Dep't of Social Svcs., 489 U.S. 189, 199-200 (1989))); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 256 (3d Cir. 2010) (explaining that the Eighth Amendment imposes a duty upon prison officials "to ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to ensure that prison officials] take reasonable measures to guarantee the safety of the inmates" (citations and internal quotation marks omitted)).

Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  See Farmer, 511

U.S. at 837.  "The knowledge element of deliberate indifference is subjective, . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837-38)).

In the instant matter, Defendants argue that the complaint's vague references to their alleged deliberate indifference to Plaintiff's constitutional rights to exercise his religion by designating him STG does not establish a violation of the Eighth Amendment. (Doc. No. 13 at 21.)  The Court agrees.  The complaint does not contain any factual allegations that Plaintiff was deprived of basic human needs, such as food, clothing, shelter, medical care, and reasonable safety.  See Tillman, 221 F.3d at 418.  The complaint also does not contain any factual allegations that they acted with deliberate indifference to Plaintiff's health or safety.  More specifically, the complaint contains no factual allegations that they knew of but disregarded an excessive risk to such health or safety.   Rather, the complaint only contains allegations stemming from the STG classification and how it has burdened Plaintiff's religious exercise. Such allegations are not, however, the province of the Eighth Amendment's Cruel and Unusual Punishments Clause.  Thus, to the extent that Plaintiff's complaint can be construed as asserting an Eighth Amendment claim, that claim will be dismissed for failure to state a claim upon which relief can be granted.

### 4.    Fourteenth Amendment

#### a.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that "no State . . . shall deny to any person within its jurisdiction the equal protection of the laws[.]"  See U.S. Const. amend. XIV.  This is, "essentially[,] a direction that all persons similarly situated should

be treated alike."  See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)

(citation omitted).  A plaintiff may bring an equal protection claim under two (2) legal theories:

(1) by "alleg[ing] that he was treated differently than other similarly situated inmates, and that

this different treatment was the result of intentional discrimination based on his membership in a

protected class, such as religious affiliation[;]" see Mack, 839 F.3d at 305[13] or (2) in a "class of

one" by alleging that he was "intentionally treated differently from others similarly situated[,]"

see Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Here, the complaint asserts an equal protection claim based on Plaintiff's membership in

a protected class—that is, his religious affiliation of NGE.  In support of this claim, the

complaint alleges that Defendants discriminated against Plaintiff and treated him differently

from other religious groups of inmates because of his membership in NGE. (Doc. No. 1 ¶¶ 14,

33.)  More specifically, Plaintiff alleges that Defendants discriminated against him and treated

him differently by placing the STG classification on him and not on any other religious groups of

inmates, such as those practicing Christianity, Nation of Islam, Judaism, Hinduism, Pagans

Buddhism, or Asatru beliefs.  (Id. ¶¶ 27, 29.)  Thus, in accepting these allegations as true, and in

construing these allegations and all reasonable inferences from these allegations in the light most

favorable to Plaintiff, the Court finds that the complaint has plausibly stated an equal protection

claim under the Fourteenth Amendment.

Although Defendants acknowledge these allegations, they have pointed to evidence

extraneous to the complaint.  More specifically, they have pointed to the responses attached to

---

[13] Although Mack was concerned with a Fifth Amendment equal protection claim, "Fifth
Amendment equal protection claims are examined under the same principles that apply to such
claims under the Fourteenth Amendment."  See Abdul–Akbar v. McKelvie, 239 F.3d 307, 317
(3d Cir. 2001).

grievance no. 912948, which state that: the DOC has "identified The Five Percent Nation as a possible threat to the security, safety, and/or operation of the State Correctional Institutions[; the DOC] has implemented and adheres to a policy for validating members of groups who pose a possible threat to the security, safety, and/or operation of State Correctional Institutions[; and this] policy applies to all inmates."  (Doc. No. 13 at 22-23.)  The Court, however, is not moved by Defendants' argument.

As a general proposition, when the Court is "ruling on a motion to dismiss, it "may not consider matters extraneous to the pleadings."  See Doe v. Princeton Univ., 30 F.4th 335, 342 (3d Cir. 2022) (citation and internal quotation marks omitted).  However, when an extraneous "document is integral to or explicitly relied upon in the complaint, it may be considered without converting the motion to dismiss into one for summary judgment under Rule 56."  See id. (citation and internal quotation marks omitted).  That said, a court's consideration of such an extraneous document will only go "so far."  See id.  Thus, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail."  See id.

While the Court does not question the significance of a DOC policy that addresses prison safety and security, the complaint does not raise any allegations or claims that are based upon this alleged policy or the underlying reasons for this policy.   As a result, the Court cannot say that these extraneous documents, or the assertions that are contained in these extraneous documents, are integral to the complaint.  And, notably, while the complaint may generally discuss the steps Plaintiff took in pursuing his administrative remedies, the Court still does not find that the claims asserted in the complaint are based upon Defendants' responses to Plaintiff's grievances.  See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (explaining, in the context

of a motion to dismiss, that "what is critical is whether the claims in the complaint are based on an extrinsic document and not merely whether the extrinsic document was explicitly cited" (citation and internal quotation marks omitted)).

Thus, for all of the reasons discussed above, the Court concludes that the complaint has plausibly stated an equal protection claim under the Fourteenth Amendment.  The Court will deny, therefore, Defendants' motion to dismiss Plaintiff' Fourteenth Amendment equal protection claim, and the Court will allow this claim to proceed against Defendant Walker.

### b.    Due Process

Plaintiff asserts violations of his due process rights under the Fourteenth Amendment to the United States Constitution (Doc. No. 1 ¶¶ 51 58, 65, 71, 78), which prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]"  See U.S. Const. amend. XIV, § 1.  "The core concept of due process is protection against arbitrary government action" and, as that core concept has developed over time, "it has come to have both substantive and procedural components."  See Evans v. Sec'y Pennsylvania Dep't of Corr., 645 F.3d 650, 658 (3d Cir. 2011) (citation and internal citation omitted).  The substantive component "limits what government may do regardless of the fairness of procedures that it employs[.]"  See Boyanowski v. Cap. Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000).  And the procedural component "governs the manner in which the government may infringe upon an individual's life, liberty, or property."  See Evans, 645 F.3d at 662.

Plaintiff's complaint, when liberally construed, appears to assert a deprivation of both "liberty" and "property."  (Doc. No. 1.)  Because the Court has already found, however, that Plaintiff procedurally defaulted his claim that he was denied the NGE National Newspaper (i.e., "property"), the Court treats his complaint as only asserting a deprivation of a "liberty" interest

under the Fourteenth Amendment.[14]   Additionally, because it is unclear whether Plaintiff's

complaint seeks to assert a procedural or substantive due process claim under the Fourteenth

Amendment, the Court will—given Plaintiff's pro se status—treat his complaint as asserting

both claims.

### (1)      Procedural Due Process

As noted above, the procedural component of the Due Process Clause "governs the

manner in which the government may infringe upon an individual's life, liberty, or property."

See Evans, 645 F.3d at 662.   The Court recognizes that prisoners, such as Plaintiff, "are not

completely deprived of the protections of the Due Process Clause simply because they are

prisoners."   See id.   Thus, "[p]rocedural protections must be afforded to them before they are

stripped of the rights they still retain while incarcerated."   See id. at 662-63 (citation omitted).

The United States Court of Appeals for the Third Circuit has explained that:

> a prisoner holds a liberty interest triggering due process protection in two
> instances: when "state statutes and regulations create a liberty interest in
> freedom from restraint that imposes an atypical and significant hardship on the
> inmate in relation to the ordinary incidents of prison life," and when "severe
> changes in conditions of confinement amount to a grievous loss that should not
> be imposed without the opportunity for notice and an adequate hearing."
> Renchenski v. Williams, 622 F.3d 315, 325 (3d Cir. 2010) (internal quotation
> marks and citation omitted).

---

[14]  In any event, it is well-established that the intentional deprivation of property by state officials
does not give rise to a cognizable due process claim if the plaintiff has an adequate post-
deprivation remedy available under state law.   See Hudson v. Palmer, 468 U.S. 517, 533 (1984).
The United States Court of Appeals for the Third Circuit has held that the DOC's grievance
system constitutes an adequate post-deprivation remedy.   See, e.g., Monroe v. Beard, 536 F.3d
198, 209-10 (3d Cir. 2008) (finding that prison official-defendants who had confiscated legal
materials belonging to the prisoner-plaintiffs did not violate the Due Process Clause, in part,
because the DOC's grievance procedure provided an adequate post-deprivation remedy).   Here,
Plaintiff concedes that he is currently pursuing available administrative remedies at SCI
Huntingdon.   (Doc. No. 18 at 28.)

See id. at 663.  The Third Circuit has characterized the first instance as a "'so-called state-created liberty interest'" and the second instance as a "'so-called independent due process liberty interest.'"  See id. (quoting Renchenski 622 F.3d at 325).  The Court addresses each of these liberty interests in turn.

### i.      Independent Due Process Liberty Interest

With respect to independent due process liberty interests, the United States Supreme Court has held that, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  See Montanye v. Haymes, 427 U.S. 236, 242 (1976).  Thus, an independent due process liberty interest arises only "when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing."  See Renchenski, 622 F.3d at 325.  Some examples of such severe changes in conditions of confinement include: "forced administration of antipsychotic medication, Washington v. Harper, 494 U.S. 210, 221-222[ ] (1990), or involuntary transfer to a mental hospital, Vitek v. Jones, 445 U.S. 480, 492[ ] (1980), or, for a prisoner not convicted of a sex offense, forced participation in sex-offender therapy, Renchenski, 622 F.3d at 326."  See Evans, 645 F.3d at 665.

Here, the Court is unable to discern an independent due process liberty interest in Plaintiff's complaint.  Specifically, the allegations in Plaintiff's complaint do not show that, as a result of his STG classification, there has been a severe change to the conditions or degree of his confinement.  See Evans, 645 F.3d at 665 (stating that "there is no indication that anything changed relating to [plaintiff's] conditions of confinement, let alone anything of a magnitude

comparable to the following examples: the forced administration of antipsychotic medication, involuntary transfer to a mental hospital, or for a prisoner not convicted of a sex offense, forced participation in sex-offender therapy).  Furthermore, and as recognized by the federal district courts of this Commonwealth, prisoners have no constitutional right to a particular status or security classification.  See, e.g., Bailey v. Wetzel, No. 19-cv-1305, 2021 WL 1060354, at *10 (W.D. Pa. Mar. 19, 2021) (stating as follows: "[t]his takes the Court to Defendants' argument that there is no evidence that Plaintiff's constitutional rights were implicated by his STG classification. Defendants are correct. An inmate has no constitutional right to a particular classification status (citing Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976))); Lawson v. Carter, No. 16-cv-2088, 2016 WL 6694860, at *2 (M.D. Pa. Nov. 14, 2016) (stating that "it is well-established that prisoners have no inherent constitutional right to placement in any particular prison, to any security classification, or to any particular housing assignment" (citations omitted)); Feldser v. Curran Fromhold Corr. Facility, No. 22-cv-0211, 2022 WL 801940, at *3 (E.D. Pa. Mar. 15, 2022) (stating that "[i]t is well-settled that prisoners have no inherent constitutional right to placement in any particular prison, to any particular security classification, or to any particular housing assignment" (citations omitted)).

Thus, for all of these reasons, the Court finds that Plaintiff's complaint has not asserted allegations that he was subjected to confinement that exceeded his sentence or that otherwise violated the United States Constitution.  See Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002) (stating, in the context of an independent due process liberty interest, that "the plaintiffs were not subjected to confinement that exceeded the sentences imposed upon them or that otherwise violated the Constitution, and therefore no liberty interest created by the Due Process Clause itself was impinged").  As such, the Court concludes that Plaintiff's complaint has not plausibly

38

stated that he was deprived of an independent due process liberty interest in connection with his STG classification.

### ii.     State-Created Liberty Interest

With respect to state-created liberty interests, the United States Supreme Court has held that these types of interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." See Sandin v. Conner, 515 U.S. 472, 484 (1995) (internal citations omitted); Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (stating that, "[a]fter Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'" (quoting Sandin, 515 U.S. at 484)).  In addition, when courts are determining whether a state-created liberty interest exists, they are not to "compare the prisoner's own life before and after the deprivation." See Powell v. Weiss, 757 F.3d 338, 344 (3d Cir. 2014).  Instead,"[t]he baseline for determining what is atypical and significant—the ordinary incidents of prison life—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." See id. (citations and internal quotation marks omitted).

Here, the Court, much like in its analysis above concerning an independent due process liberty interest, is unable to discern a state-created liberty interest in Plaintiff's complaint. Specifically, the Court finds that the allegations in Plaintiff's complaint do not show that he was subjected to an atypical and significant hardship in relation to the ordinary incidents of prison

life.  Moreover, the Court cannot say that an inmate's particular security classification, such as STG, amounts to an atypical and significant hardship in comparison to the ordinary incidents of prison life.  Rather, the Court finds that a security classification is precisely the kind of circumstance that a prisoner can reasonably expect to experience in connection with his incarceration.  Accordingly, for all of these reasons, the Court concludes that Plaintiff's complaint does not plausibly state that he was deprived of a state-created liberty interest in connection with his STG classification.

### iii.      Conclusion as to Procedural Due Process

Accordingly, because Plaintiff has failed to plausibly allege that he was deprived of an independent due process liberty interest or a state-created liberty interest, the Court finds that his complaint fails to state a claim upon which relief can be granted.  See Fraise, 283 F.3d at 522-23 (finding that the inmates' placement in a special management unit for STG members did not implicate a liberty interest under the Due Process Clause because the inmates were not subjected to confinement that exceeded the sentence that was imposed upon them and because the inmates could not establish that they were subject to an atypical and significant hardship).  As such, the Court will dismiss Plaintiff's Fourteenth Amendment procedural due process claim from the complaint.

### (2)      Substantive Due Process

As noted above, the substantive component of the Due Process Clause "limits what government may do regardless of the fairness of procedures that it employs[.]"  See Boyanowski, 215 F.3d at 399.  And, as explained by the United States Court of Appeals for the Third Circuit, "'the substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that shocks the

40

conscience.'"  See Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 447 (3d Cir. 2020)

(quoting Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994) (some internal quotation

marks omitted)).

The United States Supreme Court "'has always been reluctant to expand the concept of

substantive due process because guideposts for responsible decisionmaking in this unchartered

area are scarce and open-ended.'"  See id. (quoting Collins v. City of Harker Heights, Tex., 503

U.S. 115, 125 (1992)).  Thus, "[u]nder the more-specific-provision rule, 'if a constitutional claim

is covered by a specific constitutional provision, . . . the claim must be analyzed under the

standard appropriate to that specific provision, not under the rubric of substantive due process.'"

See id. (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).

Applying these principles here, the Court finds that, to the extent the complaint can be

construed as asserting a Fourteenth Amendment substantive due process claim, such a claim

challenges the same conduct that Plaintiff's First Amendment claim challenges—i.e., that

Defendants violated his right to exercise his religion freely.  Under these circumstances, the

more-specific-provision rule requires Plaintiff's substantive due process claim to be analyzed

under the more specific provision of the First Amendment, rather than the rubric of substantive

due process.  Consequently, the Court will grant Defendants' motion to dismiss Plaintiff's

Fourteenth Amendment substantive due process claim.  See id. at 447-48 (holding that a state

prisoner's substantive due process claim challenged the same conduct as his Eighth Amendment

claim and was thus barred under the more-specific-provision rule where there were no distinct

facts that applied only to his substantive due process claim); Fears v. Beard, 532 F. App'x 78,

81-82 (3d Cir. 2013) (concluding that, to the extent that the prisoner-plaintiff had attempted to

assert his First Amendment claims as violations of substantive due process, the district court had correctly dismissed such alleged violations under the more-specific-provision rule).

### 5.    Conspiracy

In the complaint, Plaintiff asserts that there was a conspiracy to violate his federal civil rights in contravention of § 1983.  (Doc. No. 1 ¶¶ 32-40.)  More specifically, Plaintiff alleges that Defendants conspired to have the STG classification placed on him solely for adhering to NGE practices.  (Id. ¶ 32.)  In support, Plaintiff alleges as follows: that Defendant Walker informed Plaintiff that the STG classification was a result of Plaintiff's adherence to NGE practices (id. ¶ 33); that Defendant Walker assured Plaintiff that he would "reach out to some people and see what he could find out[,]" and that this must have meant that Defendant Walker would reach out to Defendant Kauffman (id. ¶ 34 (emphasis omitted)); that Defendant Walker informed Plaintiff that he had "reached out" and "was told" that the STG classification "would remain" (id. ¶ 35); that Plaintiff had subsequently written to Defendant Wetzel and that Defendant Merritt-Scully had responded on behalf of Defendant Wetzel by directing Plaintiff to utilize the grievance process (id. ¶¶ 35-36); and that the STG classification was "utilized within the Parole Board's decision" to deny Plaintiff Parole in 2018, 2019, and 2020, regardless of whether Plaintiff had satisfied all of the requirements for parole (id. ¶ 38).   Plaintiff argues that, based on "this chronological order of [these] facts[,]" Defendants conspired to violate his rights by placing the STG classification on him for adhering to NGE practices.  (Id. ¶ 39.)  The Court, however, is not persuaded.

"[T]o prevail on a conspiracy claim under § 1983, a plaintiff must [show] that persons acting under color of state law reached an understanding to deprive [the plaintiff] of his constitutional rights."  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293-94 (3d Cir. 2018)

(citation and internal quotation marks omitted).  "This requires that the state actors took

concerted action based on an agreement to deprive the plaintiff of his constitutional rights, and

that there was an actual underlying constitutional violation of the plaintiff's rights."  Harvard v.

Cesnalis, 973 F.3d 190, 207 (3d Cir. 2020).  To show an agreement, the plaintiff must allege that

the defendants "reached an understanding to deny" the plaintiff his rights.  See Jutrowski, 904

F.3d at 295 (citation and internal quotation marks omitted); Startzell v. City of Philadelphia,

Pennsylvania, 533 F.3d 183, 205 (3d Cir. 2008) (explaining that, "[t]o constitute a conspiracy,

there must be a meeting of the minds" (citation and internal quotation marks omitted)).

Here, Defendants argue that the complaint fails to allege the requisite elements of a

conspiracy claim, namely, that Defendants acted together in any way to deprive Plaintiff of his

rights.  (Doc. No. 13 at 25.)  The Court agrees.  Even when the allegations in the complaint are

accepted as true, and construed in the light most favorable to Plaintiff, the Court still finds that

the complaint has failed to set forth sufficient factual allegations which would show that

Defendants reached an understanding to deprive Plaintiff of his federally protected rights or that

Defendants took any concerted action based upon that agreement.  Rather, the complaint has

only alleged the individual actions taken by Defendants, that those actions ultimately caused

Plaintiff's constitutional harm, and that there must have been, therefore, a conspiracy amongst

Defendants because of the "chronological order" of those individual actions.  (Doc. No. 1 ¶ 39.).

The Court finds, however, that "[i]t is not enough that the end result of the parties'

independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm

acted in conscious parallelism."  See Perez v. Gamez, 13-cv-1552, 2013 WL 6073877, at *9

(M.D. Pa. Nov. 18, 2013) (citation omitted); see generally Twombly, 550 U.S. at 556 (explaining

that, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation

of agreement at some unidentified point does not supply facts adequate to show illegality").
Instead, Plaintiff must allege sufficient factual matter to show that Defendants reached an
agreement to deprive him of his federally protected rights and that they took concerted action to
achieve that agreement.  See Twombly, 550 U.S. at 556 ("Asking for plausible grounds does not
impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a
reasonable expectation that discovery will reveal evidence of illegal agreement.").

Thus, because Plaintiff has failed to assert his conspiracy claim with factual sufficiency,
the Court finds that the complaint fails to state a § 1983 conspiracy claim upon which relief can
granted.  The Court will, therefore, grant Defendants' motion to dismiss this claim from the
complaint.

## C.      Leave to Amend

The only remaining issue is, therefore, whether Plaintiff should be granted leave to
amend his complaint.  Due to the applicable liberal pleading standard, a plaintiff should
generally be granted leave to amend before a Court dismisses a claim that is merely deficient.
See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).  The Federal Rules of
Civil Procedure allow for amendments to be granted liberally in light of the "principle that the
purpose of pleading is to facilitate a proper decision on the merits."  See Foman v. Davis, 371
U.S. 178, 182 (1962) (citation and internal quotation marks omitted).

However, the Court may deny leave to amend where there is "undue delay, bad faith[,] or
dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments
previously allowed, undue prejudice to the opposing party by virtue of allowance of the
amendment, [or] futility of the amendment[.]"  See id.  The Court may also deny leave to amend
where the proposed amendment would be futile—that is, where the pleading, "as amended,

44

would fail to state a claim upon which relief could be granted." See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002) (citations and internal quotation marks omitted).

In accordance with this standard, the Court cannot say that granting Plaintiff leave to amend would be futile as to some of the claims asserted in the complaint and, thus, the Court will grant Plaintiff leave to file an amended complaint in order to attempt to cure the deficiencies of those claims. Specifically, Plaintiff is granted leave to amend his Fourteenth Amendment procedural due process claim and his conspiracy claim. Plaintiff will not be granted leave to amend: his claims against Defendants Wetzel, Merritt-Scully, or Kaufman; his claims concerning the NGE National Newspaper; his RLUIPA claims for damages against Defendants in their individual capacities; his Eighth Amendment claim; or his Fourteenth Amendment substantive due process claim. With respect to these claims, the Court finds that further leave to amend would be futile.[15] Thus, the Court will dismiss these claims with prejudice.

Plaintiff is advised that any amended complaint must be complete in all respects. It must be a new pleading that stands by itself without reference to the original complaint or any other document already filed. The amended complaint shall set forth the claims in short, concise, and plain statements as required by Rule 8 of the Federal Rules of Civil Procedure. Plaintiff is cautioned that neither conclusory allegations nor broad allegations will set forth a cognizable claim. To the extent, however, that Plaintiff would like to forego the filing of an amended complaint and would instead like to proceed to discovery on his surviving claims, the Court will allow him to do so.

---

[15] As discussed in detail above: claims against Defendants Wetzel, Merritt-Scully, and Kaufman, and claims concerning the NGE National Newspaper, are procedurally defaulted under the PLRA; a claim for damages against Defendants in their individual capacities is not authorized by RLUIPA; the allegations in the complaint are not the province of the Eighth Amendment; and the more-specific-provision rule bars the Fourteenth Amendment substantive due process claim.

V.      **CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Defendants'

motion to dismiss and/or motion for summary judgment.  (Doc. No. 12.)  The Court will also

deny Plaintiff's pending motions to stay the proceedings.  (Doc. No. 16, 17.)  An appropriate

Order follows.